UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

SHEROLL BROWN                          CIVIL ACTION

VERSUS                                 NUMBER: 09-00487

MICHAEL J. ASTRUE,                     SECTION: "J"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


**REPORT AND RECOMMENDATION**


Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's application for Supplemental Security Income ("SSI") benefits.  (Rec. docs. 13, 15).

Sherroll Brown, plaintiff herein, filed the subject application for SSI benefits on May 10, 2004, with a protective filing date of April 7, 2004, alleging disability as of July 1,

2002.[1]/ (Tr. pp. 73-74, 72).  In a Disability Report dated December 8, 2005, the conditions resulting in plaintiff's inability to work were identified as back problems, high blood pressure, glaucoma, diabetes, nerves, and neuropathy. (Tr. pp. 76-82).  Plaintiff's application for SSI benefits was denied at the initial level of the Commissioner's administrative review process on September 20, 2004. (Tr. pp. 58-61).  Pursuant to her request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on December 22, 2006 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 351-371).[2]/ On July 28, 2006, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security of Act. (Tr. pp. 43-52). Plaintiff then requested review of the  ALJ's decision by the Appeals Council ("AC") which, on March 14, 2007, remanded the case to the ALJ for further consideration of medical source opinions, further evaluation of plaintiff's subjective complaints and mental

_____

[1]/ Plaintiff had previously filed an application for Disability Insurance Benefits ("DIB") that was denied in July of 2003 following a hearing. (Tr. pp. 353, 46, 83).  That prior application is not now before the Court and the Court has no jurisdiction to review it. Califano v. Sanders, 430 U.S. 99, 107-09, 97 S.Ct. 980, 985-86 (1977).

[2]/ At the outset of the hearing plaintiff's counsel formally amended the alleged onset date to the date that the application was filed, April 7, 2004. (Tr. p. 353).

2

impairment, and further consideration of her residual functional capacity. (Tr. pp. 37-40).

Following the remand, a second hearing was held before a different ALJ at which plaintiff, who was again represented by counsel, a new VE, and a neighbor of plaintiff's appeared and testified. (Tr. pp. 372-398). On July 9, 2008, that ALJ issued a written decision in which he also concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 12-22).  The AC subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 5-7).  It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §1383(c)(3).

In the brief supporting her request for judicial review plaintiff frames the issues to be resolved as follows:

1.  [d]efendant's decision rejects the medical opinions of a treating neurosurgeon and a primary treating physician in favor of the medical opinion of a layman who is a "claims examiner."  Was this error?

2.  [d]efendant's decision rejects the findings of a treating neurosurgeon and a primary treating physician in favor of the medical opinion of a layman without addressing the factors of 20 C.F.R. 404.1527(d). Was this error?

3.  [d]efendant's decision rejects the findings of a treating neurosurgeon and a primary treating physician in favor of the medical opinion of a layman without recontacting the treating physicians to resolve perceived discrepancies. Was this error?

3

(Rec. doc. 13, p. 1).

Relevant to the issues to be decided by the Court are the following findings made by the ALJ:

1.   [t]he claimant has not engaged in substantial gainful activity since April 7, 2004, the alleged onset date (20 CFR 416.920(b) and 416.971 et seq.).

2.   [t]he claimant has the following severe impairments: diabetes mellitus, nephrotic syndrome, low back pain and depression (20 CFR 416.920(c)).

3.   [t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.   [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a modified range of light work as defined in 20 CFR 416.967(b). She can lift/carry 20 pounds occasionally and 10 pounds frequently.  She can stand/walk 6 hours of 8 and sit for 6 hours of 8.  She can occasionally stoop, kneel, crouch and crawl.  She is limited to 1-3 step job instructions and her interaction with the public, co-workers and supervisors is also limited.

5.   [t]he claimant is capable of performing past relevant work as a housekeeper.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 416.965).

6.   [t]he claimant has not been under a disability, as defined in the Social Security Act, from April 7, 2004 (20 CFR 416.920(f), the date the application was filed.

(Tr. pp. 17-19, 21-22).

Judicial review of the Commissioner's decision to deny Social Security benefits is limited under 42 U.S.C. §405(g) to two

4

inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards.  Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).  The Court may not reweigh the evidence or try the issues de novo, nor may it substitute its judgment for that of the Commissioner.  Cook v. Heckler, 750 F.2d 391, 392 (5th Cir. 1983).  Conflicts in the evidence are for the Commissioner to resolve, not the courts. Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1985).

A claimant seeking SSI benefits bears the burden of proving that she is disabled within the meaning of the Social Security Act. Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988).  Disability is

defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which... has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).   Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled.   <u>Harrell</u>, 862 F.2d at 475.   In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §416.920, as follows:

> 1.   an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.
>
> 2.  an individual who does not have a "severe impairment" will not be found to be disabled.
>
> 3.  an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.
>
> 4.  if an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made.
>
> 5.   if an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must

6

ultimately demonstrate that she is unable to perform the work that she has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). In determining whether a claimant is capable of performing the work that she has done in the past, the ALJ is required to assess the demands of the prior work and to compare those demands to the claimant's present capabilities. Villa, 895 F.2d at 1022; Hollis v. Bowen, 837 F.2d 1378, 1386 (5th Cir. 1988); Epps v. Harris, 624 F.2d 1267, 1274 (5th Cir. 1980). The assessment of the demands of the claimant's prior work "... may rest on descriptions of past work as actually performed or as generally performed in the national economy." Villa, 895 F.2d at 1022 (citing Jones v. Bowen, 829 F.2d 524, 527 n. 2 (5th Cir. 1987)). A finding that the claimant is disabled or is not disabled at any point in the five-step review process is conclusive and terminates the Commissioner's analysis. Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987).

The documentary evidence that was generated during the relevant time period[3]/ begins with handwritten treatment notes from

---

[3]/ As a general rule, the Commissioner is required to develop the medical history of an individual seeking SSI benefits for the twelve-month period prior to the date that the application for benefits was filed. 20 C.F.R. §416.912(d). Here, plaintiff protectively filed her application for SSI benefits on April 7, 2004 and at the first administrative hearing that was held on December 22, 2005 she formally amended the alleged onset date to April 7, 2004. The relevant evidence thus precedes the latter date

Dr. Ron Taravella, a psychiatrist, for the time period of January 20, 2003 to November 8, 2004. (Tr. pp. 191-208). Unfortunately, those handwritten notes are not a model of legibility and the majority of the information contained within them is indiscernible. (Id.). On January 22, 2003, plaintiff was seen by Dr. James Hines for a lower back strain. (Tr. p. 117). She was seen again by Dr. Hines on March 27, 2003 for complaints of headaches. (Tr. p. 116). On April 29, 2003, plaintiff was evaluated by Dr. Charles Patout of the LSU Diabetes Foot Clinic and was diagnosed with tinea pedis and dry skin syndrome. (Tr. p. 174).

Plaintiff presented herself to the emergency department of the Our Lady of the Lake Regional Medical Center on July 2, 2003 with complaints of back to neck and right leg pain following a motor vehicle accident the previous day. The diagnosis was a cervical and thoracic sprain and plaintiff was discharged with Flexeril, Ultracet, and Ibuprofen. (Tr. pp. 305-312). Plaintiff was next seen by Dr. Patout on July 28, 2003 and was assessed with loss of protective sensation, tinea pedis, and dry skin syndrome. Her nails were trimmed and she was prescribed Neurontin. (Tr. p. 268). The assessment was severe 3+ tinea when plaintiff returned to Dr. Patout on September 3, 2003 and she was administered foot care and

---

by twelve months.

8

was instructed to sleep with her socks on and to wear SAS consistently. (Tr. p. 267).  The condition of plaintiff's feet was monitored further by Dr. Patout on October 20, 2003. (Tr. p. 266).  On that same date Dr. Patout issued a "To Whom it May Concern" letter suggesting that plaintiff be considered permanently disabled.  The doctor indicated that plaintiff suffered from Type II diabetes with severe peripheral neuropathy and significant nerve damage as a result of long-standing hyperglycemia.  Dr. Patout observed that "[i]t is difficult for her to endure walking or long periods of standing on her feet due to the neuropathy and resulting neuropathic pain."  Plaintiff continued to be followed through the Diabetes Foot Program on a regular basis to prevent foot injury and was maintained on neuropathic pain medication as well as special extra depth shoes to prevent further foot complications. (Tr. p. 110).  Plaintiff complained of moderate, acute, intermittent pain when she was seen by Dr. Hines on October 21, 2003 and the assessment was diabetes mellitus with a blood sugar level of 349 and hypertension ("HTN").  Glucovance was prescribed. (Tr. p. 115).

On October 22, 2003, plaintiff underwent an ECG at Our Lady of the Lake following complaints of dizziness and weakness.  Although that study demonstrated a normal sinus rhythm it also produced evidence of left atrial enlargement, left axis deviation, left ventricular hypertrophy, and poor R wave progression. (Tr. pp. 291-

293).   A chest x-ray taken on the same date was negative and
bloodwork was done.  (Tr. pp. 294-303).   The diagnosis was
hyperglycemia and plaintiff was treated with insulin and IV
medications and was discharged with instructions to monitor her
blood glucose levels and to take Glucovance if the level became
elevated. (Tr. p. 304).

Pursuant to a referral from Dr. Hines, plaintiff was evaluated
by Dr. Mitchell Hebert for possible proteinuria on October 31,
2003.  Plaintiff had no complaints at the time with no nausea,
vomiting, shortness of breath, or chest pain and a stable diet with
no hypoglycemic episodes.  Past medical history was positive for
glaucoma, non-insulin dependent diabetes since 2002, essential HTN
for three to four years, anxiety disorder, and diabetic neuropathy.
The results of a physical examination were essentially normal
except for dry skin on the lower extremities.  The assessment was
controlled Type II diabetes mellitus, proteinuria, essential HTN,
anxiety, and glaucoma. (Tr. pp. 187-189).

On November 4, 2003, Dr. Warren Williams, Sr., a neurologist,
issued a document denominated a "Disability Certificate" indicating
therein that plaintiff had been under his care, was totally
incapacitated for an undetermined period of time, and was
permanently disabled from any gainful employment.  Additional
remarks set forth on the Certificate were that plaintiff "... has

10

lots of trouble standing and walking for a long period of time ... [and] has a disc bulge or perhaps a disc herniation at L4-5 to the left causing compromise of the left lateral recess for the L5 nerve root." (Tr. p. 111). The following day Dr. Taravella authored a typewritten "To Whom it May Concern" letter declaring plaintiff to be permanently and totally disabled due to a nervous/mental disorder. Dr. Taravella recalled having treated plaintiff for the previous year for major depression with psychosis and panic disorder with medications consisting of Zyprexa, Paxil, Doxepin, Lorazepam, and Neurontin. In his opinion, plaintiff was unable to work and was chronically unable to concentrate with her condition not likely to improve significantly in the near future. In addition, plaintiff's psychiatric illness was complicated by her diabetes and HTN for which she took Metformin and Lotensin. (Tr. p. 201).

Plaintiff returned to Dr. Hebert on December 12, 2003 for a follow-up appointment and was reportedly doing well with no complaints. No fatigue, weight loss, headaches, or weakness were present and a physical examination again produced normal result with the exception of dry skin on the lower extremities. The assessment was proteinuria, controlled Type II diabetes, essential HTN, anxiety, and glaucoma. Plaintiff was to be seen again in four months and was to be referred to chronic kidney disease classes.

11

(Tr. pp. 183-186). On December 16, 2003, plaintiff was seen again by Dr. Patout and her blood pressure was measured as 110/72. Plaintiff was given a refill on her Neurontin. (Tr. p. 265). By January 13, 2004, plaintiff was said to be suffering from medium-level, chronic, constant pain. A cough, shortness of breath, wheezing, and rhonchi were present as were chest pain, low blood sugar, joint stiffness, and depression. The diagnosis appears to have been pharyngitis, diabetes, and HTN. (Tr. p. 113).

On April 5, 2004, Dr. Hebert authored a "To Whom This May Concern" missive indicating that he was following plaintiff for chronic kidney disease, proteinuria, Type II diabetes, and HTN, last seeing plaintiff on December 12, 2003. (Tr. p. 182). Plaintiff was next seen by Dr. Hebert on May 25, 2004 and she again had no complaints. The results of a physical examination once again were normal except for dry skin on the lower extremities. The assessment was proteinuria, essential HTN, controlled Type II diabetes, anxiety, and glaucoma with bloodwork to be performed in the following two to three weeks. (Tr. pp. 180-181). That bloodwork was done on June 16, 2004. (Tr. pp. 318-319). On August 11, 2004, Dr. Patout reported that plaintiff's blood sugar was elevated, that she suffered from mycotic toenails, and that her feet were dry and flaky with tinea. Plaintiff was instructed to consult with Dr. Hines as soon as possible in connection with her

blood sugar.  She was also prescribed Lamisil and Aloe Vesta and her toenails were trimmed and abraded. (Tr. p. 264).

On August 21, 2004, plaintiff was consultatively evaluated by Dr. Michael Green.  In order, plaintiff's chief complaints were identified as her back, HTN, diabetes, neuropathy, and nerves. Plaintiff complained of chronic pain to the lower back up to the neck as well as pain and numbness in the right calf almost nightly and pain in the thigh every two to three days.  She took Lortab for this pain which did provide relief and she denied any leg, bowel, or bladder dysfunction.  Plaintiff indicated that she was compliant with her HTN medication and she also reported to Dr. Green that she suffered from kidney disease.  She took Amaryl for her diabetes which by then she had suffered from for two years.  Plaintiff also advised Dr. Green that she would damage her feet if she stood on them for too long but she denied any foot numbness at the time of the evaluation.  In terms of her nerves, plaintiff stated that she felt very jittery and anxious and became upset very easily but was doing very well on her prescribed medication and exhibited no overt signs of significant mental disturbance.

In providing her social history plaintiff advised Dr. Green that she had stopped working in 2002 as an assembly line worker because she was told that she should not stand on her feet too long due to potential foot damage and pain. Plaintiff experienced foot

13

pain after standing longer than thirty minutes and estimated that
she could walk a half a block, sit for an hour, stand for fifteen
minutes, and lift five pounds.  She could feed and dress herself
and cook and wash dishes but did little else in the way of
household chores.  In addition to the medical conditions enumerated
above plaintiff also complained of migraine headaches accompanied
by photophobia, phonophobia, and nausea that occurred every three
months. After experiencing one of these headaches plaintiff would
proceed to the emergency room and would receive an injection of
pain medication.  She also suffered from occasional bouts of
bronchitis.

Upon physical examination, plaintiff's blood pressure was
measured as 140/90 and she was noted to be moderately obese.
Plaintiff moved relatively slowly but her gait appeared normal and
she could walk on her heels and toes without difficulty, could
ambulate well, and could get up and off the examination table
without significant difficulty. Plaintiff had some tenderness to
the right paraspinous muscle area at L3 and L4.  There was some
trace edema distally and a questionable positive Tinel's sign on
the left but plaintiff was able to feel a light touch to both feet.
Strength was 5/5 globally and deep tendon reflexes were 1+ on the
bilateral biceps, 1+ on the right patella, and 2+ on the left
patellar tendon.  Range of motion in both the upper and lower

14

extremities was normal as was that of the cervical spine. Complaints of right lower back pain were elicited at 80 degrees of flexion of the lumbar spine. Straight leg raising was positive at 45 degrees on the right and at 70 degrees on the left.

Based on the results of his physical examination and his review of the medical records that had been provided Dr. Green expressed uncertainty, as respects plaintiff's back condition, as to "... how she would perform under prolonged strenuous physical activity such as crouching, crawling, walking for prolonged periods, lifting heavy weights, going up stairs, etc. especially in the prolonged circumstances or under strenuous conditions." Dr. Green noted the presence of HTN, some protenuria, diabetes, and plaintiff's report of kidney disease but her creatinine levels were not known. From an end-organ standpoint plaintiff had nephropathy and, although she reported decreased sensation to the feet in the past, she was able to feel light touch at the time. As respects plaintiff's neuropathy Dr. Green observed plaintiff to have normal function in her feet without any complaints of pain and it was felt that her diabetes could be better managed to prevent further neuropathic pathology and symptomology. As for her depression the doctor opined that plaintiff was lucid, had a good recall, and did not seem anxious but he welcomed further neuropsychological testing to determine her ability to perform in a mentally strenuous

15

environment. (Tr. pp. 209-213).

On August 30, 2004, plaintiff underwent a consultative psychiatric evaluation by Dr. Larry Wade.  The doctor observed no evident abnormalities with posture, gait, or motor movements. Plaintiff's past medical history was provided by her or by way of the records Dr. Wade had been furnished.  Plaintiff reported seeing a psychiatrist one or two years earlier although she claimed that she had problems for a year or two before that.  The problems first manifested themselves with bad nerves, disrupted sleep patterns, and suicidal thoughts which were brought on after plaintiff could no longer work due to carpal tunnel syndrome and back problems. Plaintiff brought with her to the evaluation her prescription medication bottles of Paroxetine, Neurontin, Zyprexa, Doxepin, and Lorazepam with Dr. Wade observing, based on the refill dates and the number of pills that remained, that plaintiff was not taking the medications with the frequency with which they had been prescribed. When specifically questioned about it, plaintiff indicated that the prescribed medications did help her sleep and that her nerves were not as bad.  Plaintiff stated that she had last worked for a month in 2002 but could not continue secondary to cramps in her hands and back issues.

When asked about her current mental, emotional, or psychiatric symptoms plaintiff indicated that she sometimes heard people

calling her name and would see something pass by her which was in the nature of a shadow.  She also complained of being forgetful. Plaintiff socialized with her daughter, mother, and two sons, did a little reading for recreation, and attended church.  She related suffering from diabetes, HTN, glaucoma, disc problems, and carpal tunnel syndrome.  Dr. Wade noted that in addition to the three daily doses of Neurontin that had been prescribed by her psychiatrist she had also been prescribed an equal amount of doses but at three times the strength by her primary care physician for "neuropathic pain."  Plaintiff reported getting along well with co-workers in the past as long as they did not antagonize her.

On mental status examination, plaintiff related in a cooperative manner and her speech was relevant and coherent.  When asked about auditory and/or visual hallucinations plaintiff explained that she had at times thought that she heard a voice calling her name but she had not seen any visions in some time. Plaintiff's mood was slightly sullen but otherwise normal and she was oriented in all spheres. She was estimated to be in the low average range of intelligence and had a poor fund of general knowledge but had adequate concentration with no evidence of an organic impairment.  The Axis I diagnosis was dysthymic disorder and Dr. Wade opined that plaintiff probably suffered from some chronic mild depression with some concurrent mild anxiety.  From a

17

psychiatric perspective she was regarded as minimally to mildly impaired in occupational functioning, minimally impaired or unimpaired in social functioning, and no more than very minimally impaired in personal functioning. Plaintiff was deemed to be competent to manage her own funds and the psychiatric prognosis was said to be fair with her likely to remain at her then current level of functioning. (Tr. p. 215-219).

On September 15, 2004, an Administration medical consultant reviewed plaintiff's file as it was then extant and set forth his opinions in a Physical Residual Functional Capacity Assessment form. There, the consultant found that plaintiff could occasionally lift twenty pounds and could frequently lift ten pounds; could sit, stand, and/or walk for six hours per eight-hour workday; had an unlimited ability to push and/or pull; could frequently balance but only occasionally perform other postural maneuvers; and, had no manipulative, visual, communicative, or environmental limitations. (Tr. pp. 220-227). Two days later, an Administration psychologist set forth his opinions regarding plaintiff's mental impairment in Mental Residual Functional Capacity Assessment and Psychiatric Review Technique forms. By way of the former form, the psychologist found that plaintiff was moderately limited in one area of understanding and memory but not significantly limited in the other two areas; was moderately limited in two of the areas of sustained

18

concentration and persistence but not significantly limited in the other six areas; was not significantly limited in the five areas of social interaction; and, was moderately limited in one area of adaptation but not significantly limited in the other three areas. (Tr. pp. 228-231).  On the latter form the psychologist evaluated plaintiff's condition under the criteria of Listing 12.04 for affective disorders and found that plaintiff had a mild degree of limitation in the activities of daily living and in maintaining concentration, persistence, or pace but no difficulties in maintaining social functioning and no episodes of decompensation of an extended duration.  However, in his handwritten notes the psychologist remarked that plaintiff's activities of daily living were moderately restricted. (Tr. pp. 232-245).

The next treatment note appearing in the record documents plaintiff's visit to Dr. Ernest Mencer, a general surgeon, on November 2, 2004 in connection with complaints of a large right calf mass resulting from a fall in 1989/1990.  A CT scan of the leg was ordered. (Tr. p. 327).  That test was performed the following day and although the subcutaneous fat in the proximal right leg was asymmetrically prominent as compared with the left, there was no circumscribed demarcation to suggest the presence of a lipoma. (Tr. pp. 286, 326).

Also in the Administrative record is a second set of

handwritten treatment notes from Dr. Taravella that were generated in connection with a series of visits that occurred between November 8, 2004 and July 28, 2005. (Tr. pp. 256-260). Once again, the bulk of those notes are of marginal legibility. (Id.).  On November 9, 2004, Dr. Mencer ordered pre-operative testing of plaintiff at Our Lady of the Lake which included chest x-rays that produced normal results. (Tr. pp. 325, 283-285).  Excision of plaintiff's right calf mass was scheduled for November 17, 2004. (Tr. p. 325).

On November 16, 2004, Dr. Taravella completed a "To Whom it May Concern" form letter that had been provided to him by plaintiff's attorney which elicited information regarding symptoms "... of a schizophrenic, paranoid and other psychotic disorders." There, Dr. Taravella indicated that plaintiff had a flat affect and was emotionally withdrawn and/or isolated but had not suffered any delusions, hallucinations, catatonic, or other grossly disorganized behavior, incoherence, or a blunt or inappropriate affect.  The doctor checked off additional blanks on the form indicating that plaintiff had marked restrictions in the activities of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace.  Other boxes on the form were checked off to indicate that plaintiff had experienced one or two episodes of deterioration or

20

decompensation, each of an extended duration; that she suffered from a residual disease process such that a minimal increase in mental demands or a change in the environment would cause her to decompensate; that she had a documented history of one or more years of an inability to function outside of a highly supportive living situation; that she suffered from chronic depression and anxiety; and, that she could understand, carry out, or remember simple instructions and make judgments commensurate with the functions of unskilled work but did not respond appropriately to supervision, coworkers, or usual work situations or deal with changes in routine work settings. (Tr. pp. 251-252).

As scheduled, on November 17, 2004, plaintiff underwent excision of a large right calf mass at the hands of Dr. Mencer. The pathological report revealed the mass to be mature adipose tissue that was consistent with a lipoma.  A pre-operative ECG showed left   axis deviation and voltage criteria for left ventricular hypertrophy. (Tr. pp. 278-282, 322-324).   Post-operatively, plaintiff's wound healed well and she was discharged from Dr. Mencer's care on December 21, 2004. (Tr. p. 321).

On December 16, 2004, plaintiff returned to Dr. Patout for follow-up of her foot condition. She was observed to have mycotic toenails and dry, flaky feet with severe tinea. The assessment was diabetes with loss of protective sensation and tinea pedis.

Plaintiff's toenails were trimmed and abraded and she was to use Clotrimazide for two to three weeks followed by a course of AV gel. (Tr. p. 263).

On December 21, 2004, Dr. Williams completed a "To Whom it May Concern" form letter that had been furnished to him by plaintiff's attorney which was designed to illicit information about the limitations resulting from plaintiff's diabetes. The doctor checked off boxes on the form indicating that plaintiff had neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in substantial disturbance of gross and dexterous movements and in gait and station. The doctor further indicated that plaintiff's complaints were consistent with his knowledge of her condition including low back pain and painful foot neuropathy on sitting for extended periods; low back pain on protracted standing or walking; neuropathy in the hands on an average of twice per week accompanied by numbness, pain, and/or swelling; and, that on most days she must recline at will during the day for pain relief. The final questions on the form were answered to indicate that plaintiff was unable to lift and/or carry ten pounds while standing or walking up to two hours per eight-hour day, was unable to stand or walk for two hours per eight-hour day, and was unable to sit for six hours during an eight-hour day. (Tr. pp. 249-250).

On January 25, 2005, both Dr. Hebert and Dr. Hines completed similar "To Whom it May Concern" form letters respectively geared toward the limitations resulting from plaintiff's nephrotic syndrome and/or renal function impairment and those resulting from her diabetes, respectively.  For his part, Dr. Hebert completed his form letter to identify plaintiff's significant edema which was persistent for three months, chronic renal disease, and persistent motor sensory neuropathy but none of the thirteen other symptoms/signs listed on the form.  The doctor further indicated that on sitting for "protracted periods" plaintiff had to elevate her feet to hip level to reduce or preclude edema.  However, somewhat contrary to that finding and to the similar form letter Dr. Williams had completed one month earlier Dr. Hebert found that plaintiff could indeed sit for six hours in an eight-hour day without having to elevate her feet to hip level. (Tr. pp. 247-248). Also at odds with Dr. Williams' form letter was the one completed by Dr. Hines in which he found that plaintiff did not have neuropathy with significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements and in gait and station.  Like Dr. Williams, Dr. Hines found that all of the complaints enumerated on the form were consistent with his knowledge of plaintiff's condition and that she was restricted from the lifting/carrying,

23

standing/walking, and sitting requirements set forth therein. (Tr. pp. 254-255).

Plaintiff returned to Dr. Hebert on January 26, 2005 for follow-up and denied any nausea, vomiting, shortness of breath, or chest pain.  Her appetite was described as stable with no weight loss or hypoglycemic episodes.  The results of a physical examination were essentially normal except for dry skin on the lower extremities.  The assessment was proteinuria, controlled Type II diabetes, essential HTN, glaucoma, anxiety, and status post removal of a lipoma. (Tr. pp. 314-317).  The next treatment note that appears in the record documents plaintiff's return to Dr. Patout on July 19, 2005.  Plaintiff's toenails were still characterized as mycotic and her feet were dry with tinea.  The impression was diabetes with loss of protective sensation and tinea pedis.  Her toenails were again trimmed and abraded and she was prescribed AV gel and instructed to keep her feet dry and to wear cotton socks.  (Tr. pp. 348, 262). Plaintiff was seen again by Dr. Williams on December 9, 2005 who noted tenderness in the lumbosacral spine along with a reduced range of motion.  The impression was chronic back pain with an added notation that plaintiff was disabled from gainful employment. (Tr. pp. 329-330).

As was mentioned earlier, on December 22, 2005, plaintiff participated in the first of the two administrative hearings that

were held in this case.  At the outset of the hearing plaintiff's attorney formally amended the alleged disability onset date to April 7, 2004, the date that the application for SSI benefits was filed.  Plaintiff was forty-nine years of age at the time, had gone to the tenth grade in school, and had past work experience as a custodial worker and a packaging assembler but had not worked or looked for work since April of 2004.  Personally, plaintiff lived with her daughter and her six-month old granddaughter but she denied assisting with the care of or babysitting for the child. She was able to drive but had no driver's license.  Plaintiff testified that she did no shopping or household chores but she did visit with neighbors twice per week.  A typical day consisted of showering, watching TV, walking around when she became tired of sitting, and sleeping.

In response to her attorney's questioning plaintiff elaborated on her various medical conditions, the first of which she identified as her back.  Plaintiff testified to suffering from low back pain on the right which radiated into the leg as well as muscle spasms.  She ambulated with the aid of a cane or walker which had been recommended by Dr. Williams and another of her physicians.  Next, plaintiff testified to neuropathy in her feet which were constantly numb, the right worse than the left.  Her HTN made her nervous and depressed and caused redness in the eyes and

headaches.  Fatigue and frequent urination were the symptoms of her diabetes.  For her depression she took Lorazepam and Zyprexa which had been prescribed by Dr. Taravella, medications which she admitted helped her to sleep and to stay clam.  Plaintiff wore a brace on her right hand to relieve the symptoms of carpal tunnel syndrome.  She also described her lipoma excision and residual numbness in the affected leg.  Finally, plaintiff testified to being treated by one  Dr. Luckett for glaucoma with the treatment consisting of eye drops and prescription glasses that she could not afford. (Tr. pp. 353-365).

Patricia Knight, a VE, was the next witness to take the stand. She first classified plaintiff's past work as a custodial worker as unskilled and medium in exertional demands and her past work as a packaging assembler as unskilled and light.  However, the latter stint of work could not be considered to be relevant work because it had only been performed for three weeks.  After briefly touching on the five levels of exertional demands the ALJ presented a hypothetical question to the VE which assumed an individual of plaintiff's age, education, and work experience who was capable of doing medium-level work.  In answer thereto the VE testified that the individual described in the hypo was capable of performing plaintiff's past job as a custodial worker.  The ALJ then amended the hypo to reduce the exertional level of the unskilled work to

light.   In answer to the hypo as amended the VE proceeded to identify numerous jobs in the national and local economies that such an individual could perform including dining room/cafeteria attendant, bus person, dishwasher, food preparation worker, and light janitorial positions.  However, if the limitations testified to by plaintiff were fully credited there would be no jobs that she could perform. (Tr. pp. 365-369).  Upon further questioning by her attorney plaintiff estimated that she could walk half a block, stand for ten minutes, sit for fifteen minutes, and lift only five pounds. Her ability to reach above shoulder and to push and pull were compromised, bending/crawling/stooping could not be performed, and plaintiff experienced cramps and numbness in the right hand but not to the point where she dropped things. (Tr. pp. 369-371).

The administrative record below contains no treatment notes that were generated in 2006.  As noted in the procedural history recited earlier, the first ALJ issued his written decision denying plaintiff's application for SSI benefits on July 28, 2006.  (Tr. pp. 43-52).  Plaintiff returned to the Foot Clinic on January 31, 2007 for further monitoring and treatment of her skin condition. (Tr. pp. 345, 349).  She was seen there again on February 8, 2007 and her toenails were still described as mycotic and her feet were dry and flaky with tinea.  She was wearing her SAS shoes.  Aloe Vesta gel was to continue to be used and plaintiff received

27

instructions on foot care. (Tr. pp. 343-344).  On March 14, 2007,
the AC remanded plaintiff's case back to the ALJ for further
proceedings. (Tr. pp. 37-40).  Plaintiff's next visit to the Foot
Clinic was on April 19, 2007 at which time she complained of
neuropathic pain to the feet notwithstanding wearing the prescribed
shoes.   The assessment was diabetes with loss of protective
sensation and dry skin syndrome.   Neurontin was prescribed in
addition to plaintiff's other medications and plaintiff was advised
to moisturize her feet twice daily. (Tr. pp. 340-341, 276).

On June 21, 2007, plaintiff was given prescriptions for
Lexapro and Seroquel by the Baton Rouge Mental Health Clinic. (Tr.
p. 335).  She was seen there on August 16, 2007 and reported that
she was not doing well, being very irritable, depressed, and
isolated and having conflicts with others to the point where she
wanted to fight.   Plaintiff's appetite was poor but she was
sleeping well and was getting along with her daughter.   She
reported sleeping better when taking her medications but still
snapping at everyone and she had by this time been off of her
prescribed medications for a month.   Plaintiff was given a refill
on one of her medications and was to return to the Clinic in four
to six weeks. (Tr. pp. 334-335).

Plaintiff returned to the Mental Health Clinic on November 13,
2007 and advised that her daughter had moved in with her and was

helping to pay the utilities.  Unfortunately, the daughter's car was broken so they had no transportation.  Plaintiff had once again run out of her prescribed medications since the end of September.  She acknowledged that she was far better when she took them with better sleep patterns, concentration, and mood.  However, without the medications plaintiff was having difficulty sleeping, worried constantly, had passive suicidal thoughts, felt sad, and had a poor appetite.  Plaintiff was given refills on some of her medications and she made a verbal contract with the attending social worker not to harm herself. (Tr. pp. 334-333).

By January 2, 2008, plaintiff reported that the prescribed medications were working well in reducing the level of her irritability.  She stated that she had gone to a friend's house to visit over the holidays and she was caring for her granddaughter when her daughter worked.  Overall, plaintiff had seen much improvement with her mood being happy and her affect bright and with a decrease in depression and anger.  She was much more calm and boasted having a new attitude.  Plaintiff's brother had even participated in part of the session and the two had a very good rapport.  Because plaintiff was scheduled to see one Dr. Ester the following day the social worker refrained from issuing plaintiff the last refill on her medications. (Tr. pp. 333-332).  Plaintiff returned to the Mental Health Clinic on February 8, 2008 but the

record contains only a portion of the treatment note that was generated that day.  She indicated that her mood had been stable but expressed sadness over an inability to go shopping due to a lack of income.  Her sleep and appetite continued to be good, her mood had improved over time, and she had no more anger after setting boundaries with her family.  Plaintiff was to consider participating in some women's groups and was to return in one month. (Tr. p. 331).

When she was next seen at the Mental Health Clinic on March 7, 2008 plaintiff advised the social worker that she was doing well in a research study which included aerobics training for diabetics.  Plaintiff's administrative hearing was at that time scheduled to go forward in April and she continued to express financial concerns.  No family issues were complained of and the medications were working well with no reported side effects and with a stable mood.  Overall, plaintiff continued to show improvement in mood and daily functioning. (Tr. pp. 331, 336).

On June 4, 2008, the second of the two administrative hearings that were held in this case went forward.  After exhibits 1A to 20F were admitted into evidence plaintiff took the stand and was questioned by the ALJ.  By that time she was fifty-one years of age and had been living by herself for two months with no income and had not driven a car for five years.  When asked why she was unable

to work plaintiff identified problems with her back, leg, feet, eyesight, HTN, diabetes, and carpal tunnel syndrome.  In terms of her back, plaintiff testified to having "... disks messed up ..." Her right leg was more problematic but both ached from her back down to her ankles.  Plaintiff also suffered from painful neuropathy in her feet notwithstanding wearing orthopedic shoes. Oral medication was taken for her diabetes.  With respect to her carpal tunnel syndrome, plaintiff wore a brace on her right hand which she tried to sleep with, in addition to elevating the extremity, although she did miss some days and she was unable to tie her shoelaces.  Contrary to what she had reported to her social worker on January 2, 2008, plaintiff testified that her daughter was not working when they lived together and that she never helped with the care of her grandchild.

As for physical capabilities, plaintiff testified to minimal walking which elicited leg and back pain after three to four minutes.  She was doing "real well" with her mental health treatment which had helped her cope with family issues.  Plaintiff testified that her neighbor cooked, did housework, and did laundry for her and that her daughter sometimes did her shopping. Daily activities primarily consisted of taking her prescribed medications and sleeping.  Contrary to the treatment note written by the social worker that plaintiff had been involved in an exercise program for

diabetes and that the activity helped occupy her mind, plaintiff testified that she never actually started the program, apparently due to a lack of clearance from her physician, and that her remarks to the social worker were simply speculation that her participation would get her out of the house and would thus reduce her depression.  Plaintiff acknowledged that the prescribed medications did help her condition.  When asked whether she could perform a job answering phones, plaintiff answered in the negative explaining that she could not sit on a constant basis throughout the day because her medication caused her to urinate frequently and made her drowsy.  Plaintiff identified a pressure pill, Spireva Inhaler, and Zyprexa among the medications that she took but she had run out of the latter drug and was hoping to obtain more when she was to return to the Mental Health Clinic later in the month. Plaintiff had not been getting out of the house to socialize as recommended by her social worker nor had she been attending church but she hoped to be doing more in that regard in the future. (Tr. pp. 374-389).

Upon being tendered to her attorney for further questioning plaintiff testified that her feet were so painful that she could hardly walk or stand on them.  She also suffered from pain in the middle of the lower back that radiated into the legs along with muscle spasms.  Plaintiff was only able to walk from the backyard

32

to the front of her house before experiencing pain in the legs
which occasionally caused her right leg to give out and for her to
fall.  Gripping problems persisted with plaintiff's right hand and
reaching overhead caused her back to pull; thus, her girlfriend
sometimes assisted her with dressing.  Symptoms from plaintiff's
diabetes included an increase in her blood pressure, fatigue,
frequent urination, and dizziness.  Plaintiff occasionally visited
her mother but generally did not socialize well with others and she
also complained of difficulties with her memory. (Tr. pp. 389-392).

    The next witness to take the stand was Margie Shephard, a
friend/neighbor of plaintiff's.  Having seen plaintiff on a regular
basis since 2001, Shephard described plaintiff as a nervous
individual who suffered from diabetes and who had problems with
walking and with her hand.  Shephard stated that plaintiff was
simply unable to do most chores and that she thus helped plaintiff
get into and out of the bathtub and assisted her in bathing.
During the time that plaintiff's daughter lived with plaintiff,
Shephard testified that plaintiff performed no child care duties
for her granddaughter. Plaintiff rarely got out of her house, had
no outside hobbies or interests, and spent her day on the couch
either watching TV or sleeping. (Tr. pp. 392-395).

    Thomas Mungall, a VE, was the final witness to testify.  He
first classified plaintiff's past relevant work as a housekeeper as

33

light in exertional demand with a SVP of two. The ALJ then posed a hypothetical question to the VE which assumed an individual of plaintiff's age, education, and work experience who was essentially capable of performing light-level work which involved one, two, and three-step instructions.  In answer thereto the VE testified that the individual described in the hypothetical question could perform plaintiff's past work as a housekeeper.  Even if the individual needed to limit interaction with the public due to emotional problems, so testified the VE, plaintiff's past job could still be performed.  However, if plaintiff's testimony regarding her foot problems and resulting limitations in walking was fully credited her past work could not be performed.  The same was true if plaintiff was unable to follow one or two-step job instructions due to emotional problems or if she missed four to five workdays per month for whatever reason. (Tr. pp. 395-397).

As noted earlier, plaintiff challenges the Commissioner's decision to deny SSI benefits on three grounds.  In the first of those plaintiff alleges that the ALJ wrongfully rejected the opinions of Doctors Hines and Williams, as respectively set forth in the "To Whom it May Concern" letters that they executed on January 25, 2005 and December 21, 2004, in favor of those of the Administration's medical consultant as found in the Residual Functional Capacity Assessment form that he completed on September

34

15, 2004.  Under the rubric of that first challenge plaintiff additionally argues that the ALJ impermissibly formulated his own medical opinions as to the limitations resulting from plaintiff's various impairments.  In support of the latter contention, plaintiff relies upon Williams v. Astrue, 355 Fed.Appx. 828 (5th Cir. 2009), a case that was litigated by her attorney of record. In Williams, the Fifth Circuit found that, assuming that the ALJ was entitled to give less than controlling weight to the opinions of the claimant's treating physicians, there must still be evidence supporting the ALJ's finding that the claimant can stand or walk for six hours in an eight-hour workday.  Williams, 355 Fed.Appx. at 831-32.  Since the time that the decision in Williams was handed down, the Court has found no fewer than fourteen cases which have been remanded or recommended to be remanded to the Commissioner based upon its holding.[4/]  The Court was unable to find a single

---

[4/] G.D.C. v. U.S. Comm. Soc. Sec. Admin., 2010 WL 3522448, adopted, 2010 WL 3522429 (W.D. La. Aug. 31, 2010); K.D.H. v. U.S. Comm. Soc. Sec. Admin., 2010 WL 3037269 (W.D. La. Aug. 3, 2010); Lincecum v. Astrue, 2010 WL 3256356, adopted, 2010 WL 3256349 (W.D. La. Aug. 16, 2010); Esters v. Astrue, 2010 WL 3256179, adopted, 2010 WL 3257316 (W.D. La. Aug. 16, 2010); Coleman v. Astrue, 2010 WL 3257621, adopted, 2010 WL 3245126 (W.D. La. Aug. 16, 2010); Wright v. Astrue, 2010 WL 3256428, adopted, 2010 WL 3257635 (W.D. L.a. Aug. 16, 2010); Slatten v. Astrue, 2010 WL 3190644, adopted, 2010 WL 3199723 (W.D. La. Aug. 12, 2010); Bearden v. Astrue, 2010 WL 3154549, adopted, 2010 WL 3155986 (W.D. La. Aug. 9, 2010); Moreno v. Astrue, 2010 WL 3025525, adopted, 2010 WL 3025519 (N.D. Tex. Aug. 3, 2010); Hicks v. Astrue, 2010 WL 2595309, adopted, 2010 WL 2542219 (W.D. Va. June 22, 2010); Williams v. Astrue, 2010 WL

case in which <u>Williams</u> was cited but a remand was not ordered or recommended.   The courts that have ordered remands have read <u>Williams</u> as requiring a "positive statement" or "positive evidence" from a medical source that the plaintiff could, despite her limitations, perform the exertional demands of the work the claimant was deemed to be capable of performing by the ALJ.[5]/

The administrative record in the present case contains three letters, certificates, or treatment notes declaring plaintiff to be permanently disabled and another six "To Whom it May Concern" letters from four of plaintiff's doctors which contain opinions pointing to an inability to work.   Declarations that plaintiff is disabled are not binding as they embrace the ultimate issue reserved to the Commissioner.   20 C.F.R. §416.927(e)(1).   In addition, letters like the ones relied upon by plaintiff are typically entitled to little weight.   <u>Warncke v. Harris</u>, 619 F.2d

---

989216 (W.D. La. March 15, 2010); <u>Guillot v. Astrue</u>, 2010 WL 767669 (W.D. La. March 3, 2010); <u>Cook v. Astrue</u>, 2010 WL 677776 (W.D. La. Feb. 24, 2010); <u>Bailey v. Astrue</u>, 2010 WL 452122 (W.D. La. Feb. 8, 2010).

[5]/ But see <u>Joseph-Jack v. Barnhart</u>, 80 Fed.Appx. 317, 318 (5th Cir. 2003) where the Fifth Circuit panel rejected the claimant's "... argument that because the record was devoid of a residual functional capacity (RFC) assessment by a medical source, the ALJ was not competent to assess her RFC.   It is the ALJ's responsibility to determine a claimant's RFC, and such an assessment is not a medical opinion.   <u>See</u> 20 C.F.R. §§416.946, 416.927(e)."

412, 417 (5th Cir. 1980).  And contrary to plaintiff's assertion, the ALJ did not substitute the opinions of Doctors Hines and Williams for those of the Administration's medical consultant; rather, a fair reading of the ALJ's decision reveals that the consultant's opinions were simply among those that the ALJ recited in determining plaintiff's residual functional capacity. (Tr. p. 21).  The question thus becomes whether there is evidence in the record from an acceptable medical source establishing that the plaintiff is capable of performing a modified range of light work, including the ability to stand/walk and sit for six hours per eight-hour workday.

In his written decision, the ALJ correctly found that the opinions of Doctor Hines and Williams relied upon by plaintiff largley lacked objective support. (Tr. p. 21).  As for plaintiff's ability to perform the exertional demands of a modified range of light work, the ALJ stated only that "Dr. Green, a consultative examiner, opined the claimant could not perform strenuous activities." (Id.).  The entirety of Dr. Green's statement which appears in the section of his written report dealing with plaintiff's back condition is that "[g]iven the constellation of symptoms, it is unknown how she would perform under prolonged strenuous activity such as crouching, crawling, walking for prolonged periods, lifting heavy weights, going up stairs, etc.

especially in the prolonged circumstances or under strenuous conditions." (Tr. p. 212). Given the equivocal nature of Dr. Green's opinion, the Court is unable say that it amounts to a "positive statement" or "positive evidence" that plaintiff is capable of performing the exertional demands of light work as required by <u>Williams</u> and the cases that have construed it. Accordingly, a remand in this case appears to be appropriate. Upon remand, the Administration should request clarification from plaintiff's treating physician(s), including Dr. Taravella whose records are illegible, and may request a supplemental opinion from the consultative examiner, or both, which evidence should include a functional capacity evaluation or other positive statement of plaintiff's abilities. <u>G.D.C. v. U.S. Comm. Soc. Sec. Admin.</u>, 2010 WL 3522448 at *5 (W.D. La. Aug. 12, 2010).

<u>**RECOMMENDATION**</u>

For the foregoing reasons, it is recommended that plaintiff's case be remanded to the Commissioner for further proceedings consistent with the Court's opinion.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district

38

court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en banc</u>).

 New Orleans, Louisiana, this  <u>1st</u>  day of  <u>November</u> , 2010.

     <u>Alma L. Chasez</u>
      ALMA L. CHASEZ
    UNITED STATES MAGISTRATE JUDGE

39